IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

KEVIN GEARY,                          )
                                      )
            Plaintiff,                )       TC-MD 120653D
                                      )
      v.                              )
                                      )
CLACKAMAS COUNTY ASSESSOR,            )
                                      )
            Defendant.                )       **DECISION**

Plaintiff appeals the 2009-10 and 2010-11 real market value of property identified as

Account 05003823 (subject property).  A telephone trial was held on Tuesday,

November 13, 2012.  Bernard Chamberlain, Attorney at Law, appeared on behalf of Plaintiff.

Plaintiff, Steve Anderson (Anderson), broker, and Rick Castle (Castle), Eagle Home Mortgage,

loan and new business marketer, testified on behalf of Plaintiff.  Todd Cooper (Cooper),

Registered Appraiser, appeared and testified on behalf of Defendant.

Plaintiff's Exhibits 1 through 11 were admitted with Defendant's objection that because

the tenth day before trial fell on a Sunday Plaintiff's exhibits were not delivered to Defendant's

office until Monday, the ninth day before the trial and he did not receive Plaintiff's Exhibits until

the eighth day before trial.  Plaintiff's Rebuttal Exhibit 12 and Defendant's Exhibits A through F

were admitted without objection.

## I.  STATEMENT OF FACTS

The subject property is a farmhouse style single-family home that sits on 1.47 acres of

land in northeast Clackamas County.  (Def's Ex A at 3.)  The home is 3,832[1] square feet with

---

[1] Anderson stated that the subject property is a "4428 square foot home built in 1900."  (Ptf's Exs 1-1; 2-1.)

two stories, three bedrooms[2], and two bathrooms. (*Id.*) The home "was originally constructed around the turn of the century and has had several subsequent additions and remodels. The most recent addition was a 960-square-foot area added in 2005" that is "currently unfinished on the interior." (*Id.*) Plaintiff testified that the subject property's "partial basement" is approximately 5'10" in height, and of cinder block construction with a concrete floor.

The parties agree that on December 6, 2000, more than three hundred gallons of heating oil were mistakenly pumped into the subject property's basement through an abandoned fill pipe that had once been connected to a heating oil storage tank. (Ptf's Ex 11-1; Def's Ex D at 2.) The Department of Environmental Quality (DEQ) report stated that the oil spill contaminated the soil below and around the subject property's basement floor. (Def's Ex D at 3.) Plaintiff testified that six days lapsed before a "clean-up" began. Plaintiff testified that Foss Environmental performed a "Phase I investigation" and "Phase II mitigation and clean-up" of the subject property. (Ptf's Exs 11-2 – 11-3.) Foss Environmental completed Phase I in March 2001 and Phase II in April 2001. (Ptf's Ex 11-3.) After inspecting the subject property on June 11, 2002, "DEQ determined that no further remedial action was required." (Ptf's Ex 11-5.) The DEQ memorandum, dated June 19, 2002, stated:

> "A comprehensive investigation of the nature and extent of contamination was performed, and cleanup completed in a manner consistent with DEQ rule and guidance, specifically Oregon Administrative Rule (OAR) 340-122-0205 through 340-122-0360. DEQ's Environmental Cleanup Site Information (ECSI) database will be updated to reflect the no further action determination once management approval has been received."

(*Id.*)

/ / /

---

[2] Anderson testified that he did not inspect the subject property and relied on the county records, stating the subject property had six bedrooms. (Ptf's Exs 1-5; 2-6.) Cooper testified at trial that the county records have been corrected. (Def's Exs A at 6-8; B at 6-8.)

Plaintiff appeals the 2009-10 and 2010-11 subject property's real market value. For the tax years at issue, Plaintiff did not appeal the subject property's real market value to the Clackamas County Board of Property Tax Appeals. The subject property's real market value for tax year 2009-10 was $406,735 and for tax year 2010-11 was $365,941 after corrections. (Def's Ex A at 8.) Plaintiff's requested real market value for tax year 2009-10 is $127,600 and for tax year 2010-11 is $107,275. (Ptf's Exs 1-2; 2-2.) Plaintiff's requested relief for each tax year meets the statutory requirements of ORS 305.288(1), alleging a "difference between the real market value of the property for the tax year and the real market value on the assessment and tax roll for the tax year" that "is equal to or greater than 20 percent."

Plaintiff testified that he believes the subject property's real market value is negatively impacted by the spill. Plaintiff submitted a proposed work plan and cost estimate from Soil Solutions Environmental Services, Inc. (SS), stating that foundation specialist firm, Terra Firma, would be retained to install supports on the residence foundation and SS would perform site preparation, overburden and Petroleum Contaminated Soil (PSC) excavation, transport, disposal, soil sampling, backfill and site restoration, reporting and documentation. (Ptf's Ex 7.) Plaintiff submitted a copy of the Terra Firma Foundation systems proposal, stating that its proposal was "based primarily on homeowners description of problem." (Ptf's Ex 9.) Plaintiff submitted a copy of "Sub-Slab/Sub-Membrane Depressurization System Installation" proposal from SS. (Ptf's Ex 10.) Anderson testified that relying on these three proposals he "did the math to arrive at" a total cost of $287,925 for "hazmat removal." (Ptf's Exs 1-10; 2-9.) Plaintiff testified that since the 2001 remediation was complete he has not had "the soil tested" and SS did not test the soil. Plaintiff testified that no one has officially stated that additional remediation is required.

/ / /

In response to questions, Plaintiff testified that after the 2001 remediation work was complete he had a "sour feeling" and "did not want to move back in." Plaintiff testified that he tried "six times, using five or six real estate agents" to sell the subject property. Plaintiff testified that the improvements he made to the subject property in 2003 and 2005 were made to "remove dark paneling, put up sheetrock and enclose the garage" to "fix up enough to sell, to make the subject property 'presentable.' " Plaintiff testified that he never received a "written offer" and did not "disclose" the spill.

Castle testified that during his 25 years of securing loan financing for properties an appraiser must consider "personal health and safety of residents." He testified that according to the "HUD manual, a lender/appraiser has a right to reject sites." (Ptf's Exs 6-2 – 6-3.) Castle testified that a buyer cannot receive "financing until the problem is fixed." Cooper challenged the currency of Plaintiff's Exhibit 6, stating that "HUD's 2012 selling guide, part B" states that "once remediation meets DEQ standards then property is safe to inhabit." Castle responded, stating he found the document on the HUD website. Cooper disputed Castle's conclusion that a lender would not loan on the subject property now that it has "undergone all DEQ remediation requirements." Plaintiff's counsel emphasized that the "DEQ made a determination that no further action was required in accordance with Oregon Administrative Rules" and contaminants remain in the soil.

Anderson testified that he has been a real estate broker for 24 years and served on the Clackamas County Board of Property Tax Appeals for four years. He testified that a real estate broker has an obligation "to disclose potential problems" and to "advise of liability and litigation." Anderson testified that the subject property is "less marketable because there is oil in the ground." He testified that the "law changed in 2002" and a seller must make a mandatory

disclosure, referencing "Seller's Property Disclosure Statement," line 178: "Has any portion of the property been tested or treated for * * * fuel or chemical storage tanks or contaminated soil or water?" (Ptf's Ex 5-4.) In response to questions, Anderson testified that "remediation needs to take place because the property is not currently marketable" given the "underwriting laws." He testified that the "DEQ letter is 10 years old" and "the current market" would want to see "something six months or less in age."

Cooper disagreed with Anderson, testifying that the DEQ is "the authority in the state," "oversaw the remediation," and approved the remediation plan. He testified that there is a "disagreement as to any long term adverse effect on the subject property's real market value." Cooper testified that he performed market research "to determine if a negative adjustment was appropriate due to [the] prior contamination." (Def's Ex E.) Cooper testified that he began his research with 28 previously contaminated properties, and then narrowed the sample to the six properties most comparable to the subject property based on type and degree of contamination. Cooper testified that he compared the six properties' sale prices with their real market values assigned by the county. Cooper testified that he found that all of the previously contaminated properties sold for prices higher than the county's real market tax roll values. (*See id.*) Cooper testified that his "research indicated that once the contamination is properly remediated (and certified by DEQ) and given adequate seasoning time of 12-36 months with no further reported contamination, similarly contaminated properties have sold at or very near market values and with marketing times typical of non-contaminated properties." (Def's Ex A at 18.) Cooper testified that his research found no long-term stigma attached to previously contaminated properties that are comparable to the subject property. (*Id*. at 19.) Plaintiff disputed Cooper's choice of comparable properties.

Anderson testified for the 2009-10 tax year he "found 3 sales that are applicable to the subject property." (Ptf's Ex 1-1.) The three properties were located within 4 miles of the subject property, ranged in size from 2,255 square feet to 4,761 square feet and sold between March 2008 and August 2009. (Ptf's Ex 1-2.) Anderson testified that he inspected "two of the comparables." Anderson noted:

> "When comparing these 3 sales it is important to remember that these properties are not distressed as the subject is and adjustments need to be made to reflect that condition differential."

(*Id*.) Anderson testified that each of the sale prices for the three comparable properties was reduced for the remediation costs based on the proposals obtained by Plaintiff. Anderson made other adjustments, including garage, shop, size, time, and bathrooms. (Ptf's Ex 1-10.) The adjusted sale prices for the three properties ranged from $101,375 to $142,775. (*Id*.)

Anderson testified that for the 2010-11 tax year he found "one applicable sale" and "it was a bank owned property." (Ptf's Ex 2-1.) He went on to state that he "found 30 properties sold in the $350,000-$400,000 price range in Gresham between January 1, 2009 and Dec. 31, 2010. Of those 30 sales 11 were bank sales or 36.7%. * * * I feel that was a significant market segment and has to be taken into consideration for this purpose because of the scarcity of comparable sales." (*Id*.) The one property which was one of the three properties Anderson selected for tax year 2009-10 was located 2.2 miles from the subject property. (*Id.*) This property was 4,761 square feet and sold for $385,000. (*Id*.) Anderson made adjustments, including garage, shop, size, time, bathrooms and remediation. (Ptf's Ex 2-9.) Anderson determined an adjusted sale price of $107,275. (*Id*.)

Cooper testified that he has been a certified appraiser in Oregon and Washington for more than 20 years and was a general contractor from 1996 to 2009. He testified that he considered the three valuation approaches in determining the subject property's 2010-11 real

market value. (Def's Ex B at 19.) Cooper testified that "[t]he income approach was not developed." (*Id.*)

Cooper testified that "[t]he cost approach is the basis for the original valuation of the subject property for tax assessment purposes for January 1, 2009 * * *" and "January 1, 2010." (Def's Exs A at 18; B at 18.) He noted that "[a]t the time of the inspection, several inaccuracies were noted in regard to the Assessor's records" and "[t]he county records/cost approach included in this report reflects the corrections." (Def's Ex A at 19.) Cooper testified that the county's original valuation of the subject property supports a real market value of $406,735 for tax year 2009-10 and $365,941 for tax year 2010-11. (Def's Ex B at 8.) Cooper testified that "[d]ue to the age of the subject home and limited comparable site sales; the cost approach is not felt to be the best indicator of market value and very limited weight was given in the final estimate of market value." (Def's Exs A at 18; B at 18.)

Cooper testified that the sales comparison approach "is the primary approach to value and was given the most consideration as it best represents the actions of buyers and sellers of similar properties in the current marketplace." (Def's Exs A at 11; B at 11.) For tax year 2009-10, Cooper submitted the sale prices for six comparable properties as evidence of the subject property's real market value. (Def's Ex A at 4.) The sale prices range from $357,000 to $560,000. (*Id.*) Cooper testified that he adjusted each comparable property's sale price to accurately reflect the conditions of the subject property. The sale prices of Comparables #2, #4, and #5 were increased $18,800 (4.7%), $18,700 (4.9%) and $68,500 (19.2%), respectively. (*Id.*) The sale price of Comparables #1, #3, and #6 were decreased $72,100 (12.9%), $22,900 (5.3%), and $93,200 (19.4%), respectively. (*Id.*) The adjusted sale prices range from $386,600 to $487,900. (*Id.*) Cooper concluded that "Comparables #2, #3, and #4 are felt to be the best

indicators of market value as they have the lowest overall net adjustments. (*Id*. at 17.) Cooper testified that "a final estimate of value for the subject property" is "$410,000 as of 01/01/2009." (*Id*. at 11.)

For tax year 2010-11, Cooper submitted the sale prices for six comparable properties as evidence of the subject property's real market value.[3] (Def's Ex B at 4.) The sale prices range from $301,500 to $480,000. (*Id.*) Cooper testified that he adjusted each comparable property's sale price to accurately reflect the condition of the subject property. The sale prices of Comparables #2, #5, and #6 were increased $68,800 (22.8%), $51,700 (15.7%), and $42,400 (13.7%), respectively. (*Id.*) The sale price of Comparables #1, #3, and #6 were decreased $800 (0.1%), $57,900 (13%), and $49,600 (10.3%), respectively. (*Id.*) The adjusted sale prices range from $352,400 to $430,400. (*Id.*) Cooper concluded that "Comparables #1, #3, #5, and #6 are felt to be the best indicators of market value as they are felt to be the most similar to the subject property." (*Id*. at 18.) Cooper testified that "a final estimate of value for the subject property" is "$380,000 as of 01/01/2010." (*Id*. at 11.)

The subject property is "located in an area that experienced a decline in property values for twelve months prior to the effective date of appraisal." (Def's Exs A at 3; B at 3.) Cooper testified that he inspected the subject property on August 20, 2012, and "assumed that the subject property was in similar overall condition as of the effective date of appraisal * * *. The owner has indicated that no significant changes were made during the interim period." (Def's Exs A at 10; B at 10.) Cooper made adjustments for time, condition, size, garage, bathrooms, fireplaces, outbuildings, unfinished area, heating/cooling and view, as appropriate for each comparable property. (Def's Exs A at 4; B at 4.)

---

[3] Plaintiff did not include any of the six previously contaminated properties as one of the six comparable properties analyzed to determine the subject property's real market value.

Cooper testified that even though the comparable sales approach indicates a real market value in excess of the tax roll for tax year 2009-10 and 2010-11 "the county is not requesting an increase in real market value."

## II. ANALYSIS

At issue in this case is the subject property's real market value for tax year 2009-10 and 2010-11. Real market value is defined in ORS 308.205(1)[4] as:

> "[T]he amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2009-10 tax year was January 1, 2009, and the assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007(2). The legislature requires real market value to be determined in all cases by "methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). There are three methods of valuation that are used to determine real market value: 1) the cost approach, 2) the sales-comparison or comparable sales approach, and 3) the income approach. *Allen v. Dept. of Rev.,* 17 OTR 248, 252 (2003); s*ee also* OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property).

Because the subject property is a residence and not an income producing property, the income approach is inapplicable. Defendant concluded a real market value of $367,189 for the cost approach. Both parties gave the comparable sales approach the most consideration. (Ptf's Exs 1-1; 2-1; Def's Exs A at 11; B at 11.)

---

[4] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2009.

OAR 150-308.205-(A)(2)(c), states that, "[i]n utilizing the sales comparison approach[,] only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value is incorrect on the tax roll. ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.,* TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Revenue,* 4 OTR 302 (1971)). Plaintiff must also provide competent evidence of the real market value of the property, as criticism of the county's position is not sufficient to satisfy Plaintiff's burden of proof. *Woods v. Dept. of Rev.,* 16 OTR 56, 59 (2002) (citing *King v. Dept. of Rev.,* 12 OTR 491 (1993)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor,* TC–MD No 110300D, WL 879285 (March 13, 2012). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P.2d 235 (1990)).

Plaintiff believes that the subject property has a continuing "stigma" specifically arising from the more than 300 gallons of oil that was spilled in the basement and leached to the surrounding area. He believes that the "stigma" decreases the subject property's real market value. Plaintiff offered no evidence to support his belief.

Plaintiff testified that even though he has listed the subject property for sale "five or six times" he has never disclosed the oil spill incident to a potential buyer. Plaintiff offered no

market evidence that a buyer would reduce or withdraw a purchase offer because the subject property sustained an oil spill eight or nine years prior to the assessment date. Plaintiff believes that because he is required by law to disclose the oil spill to a potential buyer that potential buyer will significantly reduce his or her purchase offer. Plaintiff's belief is unproven.

Defendant submitted "specific market data for previously contaminated sites." (Def's Exs E; F.) For six previously contaminated properties Cooper identified were comparable to the subject property, Cooper submitted evidence, showing that each of those properties sold for more than the real market value on the tax roll. (Def's Ex E at 1.) Even though Plaintiff challenged one or two of the properties as not comparable to the subject property, Plaintiff offered no evidence to rebut Defendant's conclusion that a property meeting state remediation requirements for contamination clean-up would not have a real market value more than the real market value on the tax roll. Plaintiff alleged that lenders will not loan on contaminated property. Plaintiff offered no evidence to support that allegation or rebut the numerous completed sales of contaminated properties documented by Cooper. (Def's Ex F.)

In support of his belief that the subject property has a stigma, Plaintiff requested a remediation clean-up proposal. The information about the oil spill came from Plaintiff, including a site map outlining the extent of the spill that was prepared by Hart Crowser in March 2001. (Def's Ex D at 5; *see also* Ptf's Exs 3-24 – 3-25.) Soil samples were not extracted nor analyzed for the remediation proposal. Plaintiff admitted that the last site inspection was completed by the Department of Environmental Quality on May 30, 2002. (Def's Ex D at 4.) On June 19, 2002, the Department of Environmental Quality concluded that no further state action was required. (*Id*. at 1.) Plaintiff's witness, Anderson, testified that the "DEQ letter is ten years old" and the "current market would want to see a letter that is six months or less in age."

Plaintiff did not commission a site inspection and accompanying report to support his belief that the subject property is contaminated as of the assessment dates or to address the market issue raised by Plaintiff's witness. The court has no evidence to support Plaintiff's belief that the subject property has a stigma that reduces its real market value.

Plaintiff's requested real market value is based on a sales comparison approach that made a $287,925 "hazmat removal" adjustment to each comparable property's sale price. (Ptf's Exs 1-10; 2-8.) That amount was based on a remediation proposal prepared without inspecting the subject property or taking and analyzing soil from the subject property's site. The court finds that adjustment is unsubstantiated.

### III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that no change shall be made to the subject property's real market value on the tax roll. The subject property's real market value for the 2009-10 tax year is $406,735 and for the 2010-11 tax year is $365,941 after corrections. Now, therefore,

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ___ day of January 2013.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Presiding Magistrate Jill A. Tanner on January 14, 2013. The court filed and entered this Decision on January 14, 2013.*